IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Criminal Action No. 21-59 (MN) |
| | ) |
| TAIKWAN PRITCHETT, | ) |
| | ) |
| Defendant. | ) |

**<u>MEMORANDUM OPINION</u>**

Michael F. McTaggart, U.S. Attorney's Office, Wilmington, DE – Attorney for Plaintiff

Eleni Kousoulis, David Pugh, Federal Public Defender's Office, Wilmington, DE – Attorneys for Defendant

March 2, 2023
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE**

On August 24, 2022, Defendant filed a Motion to Suppress Evidence ("Defendant's Motion"). (*See* D.I. 31). The Government responded on September 9, 2022.[1] (*See* D.I. 32). The Court conducted an evidentiary hearing regarding the issues raised on November 2, 2022, during which it requested additional briefing from the parties. (*See* D.I. 34). The parties completed supplementary briefing on January 3, 2023. (*See* D.I. 36, 37 & 38). The Court has carefully reviewed all the filings and evidence submitted and listened to the testimony presented at the hearing. For the reasons set forth in this opinion, IT IS HEREBY ORDERED that Defendant's Motion to Suppress is GRANTED.

**I.      BACKGROUND**

At approximately 6:30 p.m. on July 23, 2021, Officers Williams and Rosaio ("the Officers") were patrolling with their unit[2] near the 1300 block of East 29th Street in the Riverside neighborhood of Wilmington, Delaware. (D.I. 34 at 5:20-6:23). The Officers were in an unmarked police vehicle. (*Id.* at 6:12-16). Upon turning left onto East 29th Street, the Officers observed an individual[3] on the corner look at their vehicle and turn and shout something towards a group of people standing further down the sidewalk. (*Id.* at 8:18-9:9 & 64:14-65:1). The Officers testified that based on their experience, they believed this individual may be a "lookout" and that he was

---

[1]     Defendant did not file a reply.

[2]     The unit included Officers Williams, Rosaio, Shulz and Moses. (D.I. 34 at 6:1-7). Only Officers Williams and Rosaio testified. (*See* D.I. 34).

[3]     Officer Williams testified that he knew the individual from "previous police encounters" but did not specify the circumstances or nature of these encounters. (*See* D.I. 34 at 9:10-14). In any event, the Government does not rely on this individual's conduct to support a finding of reasonable suspicion, and thus, neither does the Court.

alerting the group of people that police were present. (*Id.* at 9:24-10:4 & 64:14-65:9). The Officers then observed Defendant among this group of people.[4] (*Id.* at 11:16-21, 12:12-17 & 66:9-13).

Defendant was carrying a black satchel on his right side. (*Id.* at 11:16-21). After the individual on the corner shouted, Defendant looked in the direction of the vehicle and the individual. (*Id.* at 12:22-13:4, 66:20-67:10 & 73:25-74:4). After Defendant looked towards the vehicle, the Officers saw the Defendant turn the right side of his body – the side on which he carried the satchel – away from their vehicle, grab a woman who was standing nearby around the neck or shoulder, pull her close to his right side and walk at a fast pace southbound towards a courtyard. (*Id.* at 12:22-13:23, 14:17-15:5, 36:22-37:24 & 66:20-67:10). The testimony is conflicting with respect to whether, at the point that Defendant looked towards the vehicle, he was facing north or south, whether he had already been walking southbound or standing still and in which direction he turned his body.[5] (*See id.* at 12:22-13:23, 35:9-37:8, 67:1-10 & 73:20-76:1).

The Officers stated that, at this point, they believed Defendant was exhibiting characteristics of an armed gunman. (*Id.* at 13:12-16 & 67:11-14). The Officers' belief was based on their experience and training. (*Id.* at 13:17-14:16 & 60:25-62:19). More specifically, the Officers had received training that armed gunmen may turn their body away from police in order

---

[4] Officer Williams testified that he knew of Defendant from previous "encounters" with him but did not specify the circumstances of those encounters. (*See* D.I. 34 at 12:5-10). Officer Rosaio testified that he was "aware of" Defendant. (D.I. 34 at 66:14-16).

[5] Officer Williams testified that Defendant was standing still facing north, and, upon looking towards the vehicle, turned his body 180 degrees away from the vehicle and then began walking southbound with the woman. (*See* D.I. 34 at 12:24-13:16 & 35:9-37:8). Officer Rosaio testified that Defendant was already walking southbound, and, upon looking towards the vehicle, angled his body slightly away from the vehicle and continued walking south. (*See* D.I. 34 at 67:1-10 & 73:20-76:1). The officer reports are similarly contradictory with respect to these facts. (*Compare* D.I. 31, Ex. C at PRITCHETT-00000013 *with id.*, Ex. D at PRITCHETT-00000015-16).

to hide a firearm from view, also referred to as "blading." (*Id.*). In addition, Officer Rosaio testified he had received training that an armed gunman may position his body behind an object to block law enforcement's view of the gun. (*Id.* at 62:1-7). The "blading" coupled with the fact that Defendant pulled the woman close to the side on which he carried the satchel and quickly walked away from the vehicle indicated to the Officers that he may be armed. (*See id.* at 13:12-16 & 66:20-67:14). The Officers then got out of their vehicle and began walking towards Defendant while he was walking southbound away from their vehicle.[6] (*Id.* at 15:20-16:10 & 67:15-20). Officer Williams shouted, "Stop, police." (*Id.* at 16:21-17:4). Defendant picked up his pace walking southbound. (*Id.*). Both Officers began to run towards Defendant.[7] (*Id.* at 49:18-51:5 & 67:17-25). Defendant then "released" or "pushed" the woman he was walking with and ran into the rear of the residence at 1313 East 28th Street[8] on the southernmost side of the courtyard.[9] (*Id.* at 17:2-8 & 19:9-12).

---

[6]  Just before getting out of the vehicle, Officer Rosaio turned on his body camera. (*See* D.I. 31, Ex. H & D.I. 34 at 68:18-23). Officer Williams turned on his body camera after the Officers seized Defendant and were exiting the residence. (*See* D.I. 31, Ex I & D.I. 34 at 25:12-16). The Court has reviewed both body camera recordings and listened to the Officers' testimony explaining what can be viewed in the recordings during the evidentiary hearing. Much of the testimony, however, pertains to circumstances either not recorded or not visible in the video recordings.

[7]  At some point after Defendant picked up his pace, Officer Williams shouted "Stop, police" again, but it is unclear if this occurred before or after the Officers began running. (*See* D.I. 34 at 16:21-18:7).

[8]  The parties stipulated that Defendant is not a resident of 1313 East 28th Street. (*See* D.I. 34 at 2:8-15).

[9]  At the hearing, there was initially some confusion with regard to whether it was Defendant or the Officers who ran first. At first, Officer Williams testified that Defendant began to run after the Officer "pick[ed] up [his] pace." (D.I. 34 at 16:23-17:4). Officer Williams later clarified that he began to "jog" towards Defendant while Defendant was still walking in order to catch up. (*See id.* at 49:18-50:20; *see also* D.I. 31, Ex. H at 00:23). Officer

The Officers ran into the residence after Defendant, and Officer Williams took hold of Defendant inside the house. (*Id.* at 18:20-20:4 & 67:17-2; *see also* D.I. 31, Ex. H at 00:35). Officer Williams grabbed the satchel and felt what he believed to be a firearm due to its L-shape and weight. (D.I. 34 at 20:21-21:9). The Officers removed Defendant from the house, and he was placed into handcuffs. (*Id.* at 21:2-4 & 22:2-4; *see also* D.I. 31, Ex. H at 01:03). Officer Williams then unzipped the satchel and found a firearm inside. (D.I. 34 at 21:19-24; *see also* D.I. 31, Ex. I at 00:18). After Defendant was handcuffed, Officer Williams saw a white object fly from Defendant's body. (D.I. 34 at 24:11-17; *see also* D.I. 31, Ex. H at 01:49). Officer Williams testified that, upon seeing the object, he believed it to be packaged heroin based on his experience and training. (*Id.* at 27:12-19). Officers placed Defendant in the back of their patrol vehicle and took him to the station. (D.I. 31, Ex. C at PRITCHETT-00000013). Officers also uncovered $1,467.00 in cash from the satchel, as well as two clear plastic bags containing pills from the area where Defendant was seated in the police vehicle and two additional bags of what appeared to be heroin from his person. (*See* D.I. 31, Ex. C at PRITCHETT-00000013-14).

Defendant was arrested and subsequently charged and indicted with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2), as well as indicted for possession with intent to distribute heroin and fentanyl in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(C) and with possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). (*See* D.I. 1, 13 & 22). Defendant moved to suppress all the physical evidence uncovered as a result of his seizure. (*See* D.I. 31).

---

Rosaio also testified that Officer Williams was "running" while Defendant was still walking towards the residence. (*See* D.I. 34 at 67:17-25).

### II.     LEGAL STANDARD

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Any evidence obtained as a result of an unreasonable search or seizure "must be suppressed as 'fruit of the poisonous tree.'" *United States v. Bey*, 911 F.3d 139, 144 (3d Cir. 2018) (quoting *Unites States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006)). "Generally, for a search or seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based upon probable cause." *Id.* "Warrantless searches and seizures are presumptively unreasonable unless the Government satisfies its burden of establishing that one of the exceptions to the warrant requirement applies." *Id.* (citing *California v. Acevedo*, 500 U.S. 565, 580 (1991)). One exception to the warrant requirement is the *Terry*[10] stop. *Id.* Under *Terry*, an officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). In order to establish reasonable suspicion, the "officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Id.* at 123-24 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)) (internal quotation marks omitted). Rather, the officer must be able to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003) (quoting *Terry*, 392 U.S. at 21) (internal quotation marks omitted). That is, the officer must have had "some minimal level of objective justification for making the stop." *United States v. Thompson*, 772 F.3d 752, 758 (3d Cir. 2014) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (internal quotation marks omitted).

In evaluating whether reasonable suspicion existed, a court must consider "the totality of the circumstances leading up to the moment of the defendant's seizure." *United States v. Graves*,

---

[10]     *Terry v. Ohio*, 392 U.S. 1 (1968).

5

877 F.3d 494, 498 (3d Cir. 2017). The court must "give considerable deference to police officers' determinations of reasonable suspicion given their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* at 499 (quoting *United States v. Brown*, 765 F.3d 278, 290 (3d Cir. 2014)) (internal quotation marks omitted). An officer may thus find reasonable suspicion "based on acts capable of innocent explanation." *Id.* (quoting *United States v. Whitfield*, 634 F.3d 741, 744 (3d Cir. 2010)) (internal quotation marks omitted).

## III.  DISCUSSION

Defendant seeks to suppress the physical evidence obtained as a result of his seizure. (D.I. 31 & 36). Defendant argues that the Officers seized and searched him without reasonable suspicion in violation of the Fourth Amendment, and thus the evidence must be suppressed.[11] (*See* D.I. 36 at 1). The Government counters that, at the time the Officers executed the *Terry* stop, they had reasonable suspicion that Defendant was carrying a concealed weapon in violation of 11 Del. C. § 1442.[12] (*See* D.I. 37 at 8). For the reasons below, the Court finds that the record before it is insufficient to support a finding of reasonable suspicion at the time of the seizure.

---

[11]  In his initial Motion, Defendant argued that the Officers unlawfully entered the home at 1313 East 28th Street. (D.I. 31 at 5-7). The Government countered that Defendant failed to establish that he had standing to assert his Fourth Amendment rights with respect to the entry of the house. (D.I. 32 at 4-5). Defendant did not reassert the argument in his supplemental briefing. (*See* D.I. 36 & 38). After the supplemental briefing was completed, however, Defendant submitted "supplemental authority" with several pages of argument apparently attempting to revive the argument. (D.I. 39 & 41). Given that the Court finds that the Officers did not have reasonable suspicion to seize Defendant, regardless of their entry of the house, the Court does not reach the issue of Defendant's standing to challenge the warrantless entry of the residence.

[12]  The Government also argues that the Officers had probable cause at the point of seizure. (D.I. 37 at 9-10). Defendant states that the Officers had no probable cause at the point of seizure but does not argue the issue substantively. (*See* D.I. 36). The question of probable cause is relevant in assessing the constitutionality of a warrantless arrest. *See United States v. Navedo*, 694 F.3d 463, 474 (3d Cir. 2012) (a showing of probable cause is required to

6

The parties do not dispute that the seizure, or *Terry* stop, occurred when the Officers grabbed hold of Defendant inside the residence of 1313 East 28th Street. (*See* D.I. 31 at 7 & D.I. 37 at 7); *see also California v. Hodari D.*, 499 U.S. 621, 626-27 (1991) (holding that a seizure requires "either physical force" or "where that is absent, submission to the assertion of authority"). Therefore, the question is whether, at that point, the Officers had reasonable suspicion to effectuate the stop. *See Graves*, 877 F.3d at 498.

The Government argues that the following circumstances support the Officers' reasonable suspicion: (1) Defendant's presence in a high crime area, (2) Defendant's furtive conduct before he walked away from the police vehicle, including "blading" his body and pinning a woman to his side and (3) Defendant's actions of walking away from the police vehicle, refusing to obey police commands and running into the house. (*See* D.I. 37 at 8). The Government's primary argument is that, under *Illinois v. Wardlow*, this evidence is sufficient to establish reasonable suspicion. (*See id.*). In *Wardlow*, the Supreme Court held that a suspect's unprovoked, headlong flight upon noticing police presence in a high crime area supports a finding of reasonable suspicion. *See* 528 U.S. at 125. The issues for the Court to consider are thus (A) whether the government has put

---

make a lawful arrest). Neither of the party's briefs nor any of the evidence on record, however, makes clear when the *Terry* stop matured into a formal arrest. The Officers testified that they took Defendant "into custody" and placed him in handcuffs once outside of the house but do not clarify whether this was the point at which they arrested him. (*See* D.I. 34 at 20:19-21:4 & 67:17-68:2). The Court finds, however, that—regardless of the point of arrest—the Officers lacked the reasonable suspicion required to lawfully stop Defendant in the first place. Because the Officers lacked reasonable suspicion at the point of seizure, they necessarily lacked probable cause as well. *See United States v. Graves*, 877 F.3d 494, 498 (3d Cir. 2017) ("The reasonable suspicion standard is lower than probable cause . . . ."). Thus, all evidence obtained as a result of the stop, including evidence obtained that may have provided the Officers with probable cause to arrest, must be suppressed. The Court does not reach the issue of when the *Terry* stop matured into a formal arrest. *See generally United States v. Goode*, 309 F. App'x 651, 653-54 (3d Cir. 2009) (nonprecedential) (assessing whether a *Terry* stop had matured into a formal arrest).

forth sufficient articulable facts to establish that Defendant was present in a high crime area, (B) whether Defendant's actions constitute unprovoked, headlong flight under *Wardlow* and (C) whether, in light of these two considerations, the totality of the circumstances supports a finding of reasonable suspicion. The Court considers each of these issues in turn.

    A.    <u>High Crime Area</u>

The Government asserts that Defendant's presence in a high crime area, coupled with the other evidence, supports a finding of reasonable suspicion. (D.I. 37 at 8). Defendant argues that the Government has not put forth sufficient evidence to show that the area in question is a high crime area. (D.I. 36 at 2-3). The Court agrees with Defendant.

In support of its contention that Defendant was present in a high crime area, the Government cites to the following testimony from Officer Rosaio:

> Q: And have you recovered firearms from individuals in the area of Riverside?
>
> A: Yes, our unit has, yes.
>
> . . . Q: All right. Specifically you're familiar with the area of 29th and Bowers?
>
> A: Yes, sir.
>
> Q: Have you investigated other cases there?
>
> A: Yes.
>
> Q: What kind of cases have you investigated in the area of 29th and Bowers Street?
>
> A: Drug or firearms related cases.
>
> Q: In terms of the amount of crime in that area, how would you describe it?
>
> A: I would consider it to be a high crime, high drug area.

(D.I. 34 at 62:11-63:6). The other evidence the Government cites to is the following testimony from Officer Williams:

> Q. I'm sorry, did you give the location where you were?
>
> A: Riverside area to be exact, the 1300 block of East 29th Street, sir.
>
> Q: And are you familiar with that area?
>
> A: Yes, sir.
>
> Q: Have you handled other investigations in that area?
>
> A: Yes, sir.
>
> Q: What kind of investigations?
>
> A: Shootings, homicides, burglaries, drug complaints.

(D.I. 34 at 6:21-7:4). The Court has scoured the record and the only other evidence it can find pertaining to this issue is from two officer reports. Officer Rosaio's report states, "It should be noted that [the area of 2800 Bowers Street] is a high crime/high drug area, where subjects will frequently congregate to engage in illegal street level drug transactions and other various forms of criminal activity." (D.I. 31, Ex. C at PRITCHETT-00000012). Officer Shulz's report states, "It should be noted, [the area of East 29th Street and Bowers Street] is considered a high crime/high drug area within the City of Wilmington in which officers often respond to reports of shots fired/shootings, illegal drug possession/sales complaints, loitering etc." (D.I. 31, Ex. E at PRITCHETT-00000028).

The Court cannot find that this evidence constitutes the specific, articulable facts needed to support a rational inference that the area is a high crime area. The record is devoid of any specific facts that point to the degree or amount of crime in the area or the time period in which the referenced investigations or complaints took place. *See United States v. Wright*, 485 F.3d 45,

53-54 (1st Cir. 2007) (noting that "temporal proximity between evidence of heightened criminal activity and the date of the stop" at issue is relevant to assessing whether the government has met its burden to prove the area is high crime). Although the evidence before the Court may establish that there has been *some* crime in the area in question, it fails to establish that the area is a *high* crime area. Mere conclusory statements that an area is "high crime" and vague references to "investigations" and "reports" – without more – fails to meet the minimum objective criteria required to make a showing of reasonable suspicion.

The Government argues that Defendant did not offer any evidence to support a finding that the area is *not* high crime. (*See* D.I. 37 at 12). It is the Government, however, that bears the burden, not Defendant. Here, the Government has failed to meet its burden and put forth sufficient specific evidence to support a finding that the area in question is a high crime area. *See United States v. Navedo*, 694 F.3d 463, 471-72 (3d Cir. 2012) ("The evidence of a prior shooting in January and a report of a domestic disturbance involving a gun in February, without more, did not provide sufficient evidence to conclude that the area surrounding 315 Park Avenue was a high crime area . . . ."); *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004) (district court finding that an area was not high crime was not clearly erroneous when "the log book [of arrests] reflected that there was an average of 1.3 arrests per week, and that most of the arrests were for misdemeanors and summary offenses").

    B.    <u>Defendant's Evasive Conduct</u>

In addition, the Government contends that Defendant's walking away from the police vehicle and ultimately running from the police, coupled with the other evidence, supports a finding of reasonable suspicion. (*See* D.I. 37 at 8). The Government likens the facts of this case to those at issue in *Wardlow*, in which the Supreme Court held that headlong, unprovoked flight upon noticing the police "plus some other indicia of wrongdoing, can constitute reasonable suspicion."

*Bonner*, 363 F.3d at 217 (citing *Wardlow*, 528 U.S. at 125-26).  Although the Court agrees that Defendant's evasive behavior is relevant to the reasonable suspicion inquiry, the record before the Court does not demonstrate that Defendant's conduct rises to the level of the flight at issue in *Wardlow*.

In *Wardlow*, the Court distinguished unprovoked flight from "a mere refusal to cooperate," stating that an individual "has a right to ignore the police and go about his business." 528 U.S. at 125; *see also Johnson v. Campbell*, 332 F.3d 199, 208 (3d Cir. 2003) ("[A]n individual has a right to ignore the police and go about his business without that activity being deemed inherently suspicious." (quoting *Wardlow*, 528 U.S. at 125) (internal quotation marks omitted)).  This distinction is significant because "the Supreme Court has 'consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.'" *Johnson*, 332 F.3d at 208 (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)).  In line with this precedent, the Third Circuit has concluded that "[w]alking away from the police hardly amounts to the headlong flight considered in *Wardlow* and of course would not give rise to reasonable suspicion by itself, even in a high-crime area." *United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000); *see also United States v. McCray*, 148 F. Supp. 2d 379, 389-90 (D. Del. 2001) (same); *Hall v. Dodge*, No. 6:12-CV-1808-MC, 2013 WL 4782208, at *4 (D. Or. Sept. 5, 2013) ("[Defendant] did not engage in 'headlong flight,' but merely continued walking away at a quicker pace than his prior 'very slow' pace.").  Therefore, Defendant's initial act of walking away from the vehicle does not amount to the headlong flight at issue in *Wardlow*.  In addition, the fact that there was testimony that he was already walking in that direction before looking towards the unmarked vehicle further weakens the weight this evidence holds in the reasonable suspicion inquiry.  (*See* D.I. 34 at 67:1-10).

11

The question is then whether Defendant's act of running into the residence upon having two officers begin running towards him amounts to the headlong, unprovoked flight at issue in *Wardlow*. The Court finds that it does not. The type of flight at issue in *Wardlow* was immediate flight upon noticing mere police presence. *See Wardlow*, 528 U.S. at 122-24; *cf. Navedo*, 694 F.3d at 466, 471-73, 477 (applying *Wardlow* in a case where Defendant immediately fled upon noticing police); *United States v. Starkey*, No. 13-654-1, 2014 WL 5810659, at *6 (E.D. Pa. Nov. 4, 2014) (same); *United States v. Lopp*, 186 F. Supp. 3d 1037, 1043 (N.D. Cal. 2016) ("Typically, [headlong flight] is an extreme reaction to the mere presence of law enforcement: a sudden and high speed departure."). The evidence here does not show that Defendant's flight was immediate, unprovoked or done in response to mere police presence. Rather, the testimony indicates that – at most – Defendant began walking towards a house in response to police presence and, upon having two officers run towards him, picked up his pace to get inside the house. Furthermore, at the hearing, the testimony and video evidence indicated that his "flight" likely covered a span of just a few paces. (*See* D.I. 34 at 18:17-19 & 67:17-68:2). Although the Court finds that this evasive conduct appears more suspicious than the act of merely walking away or refusing to cooperate, the evidence, taken together, fails to show that this conduct rises to the level of *Wardlow*-like flight.

The Court does not suggest that evasive behavior must rise to the level of *Wardlow*-like flight in order to be relevant to the reasonable suspicion inquiry. "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124; *see also Valentine*, 232 F.3d at 357 (noting that the act of walking away from police "is a factor that can be considered in the totality of the circumstances"). Rather, the distinction between evasive conduct and unprovoked, headlong flight goes to the weight of the evidence in a reasonable suspicion inquiry. *Compare Wardlow*, 528 U.S. at 124-25 (headlong, unprovoked flight in a high crime area

creates reasonable suspicion), *with Valentine*, 232 F.3d at 357 (walking away from police in a high crime area is not sufficient to create reasonable suspicion).  With these considerations in mind, the Court turns to assessing the totality of the circumstances at the moment of seizure.

      C.      <u>Totality of the Circumstances</u>

Given the Court's finding that the Government has failed to show that the area in question is a high crime area, the evidence that remains is the following: (1) Defendant's "blading" away from the unmarked vehicle and pulling a woman to the side on which he carried a satchel, (2) Defendant's act of walking away upon looking towards the vehicle and picking up his pace after Officer Williams issued commands and (3) Defendant's act of running into the house after the Officers began running towards him.  The Court finds that the totality of the evidence here is insufficient to support a finding of reasonable suspicion.

First, even if the Court were to find that Defendant's conduct constituted the same type of headlong flight considered in *Wardlow*, the unique facts of this case would be insufficient to support a finding of reasonable suspicion.  Headlong flight alone is not sufficient to justify a *Terry* stop.  *Navedo*, 694 F.3d at 471-72 (3d Cir. 2012) (citing *Wardlow*, 528 U.S. at 124).  Rather, officers need flight "plus some other indicia of wrongdoing" to justify the stop.  *Bonner*, 363 F.3d at 217.  Here, the "other indicia of wrongdoing" consists of the furtive movements such as Defendant's angling of his body away from an unmarked car and pulling a woman close to his side.  Although the Court gives considerable deference to the Officers' training and experience that suggests such movements can indicate that a suspect may be armed, that deference here is weakened by the fact that the testimony surrounding Defendant's conduct was contradictory.  For example, one officer testified that Defendant was initially facing north, and upon looking towards the vehicle, turned his body 180 degrees and began walking south.  (D.I. 34 at 12:24-13:16 & 35:9-37:8).  In contrast, the other officer testified that Defendant was already facing south and walking

southbound when he looked towards the vehicle and then only "slightly altered" the position of his body away from the vehicle upon looking towards it. (D.I. 34 at 67:1-10 & 73:20-76:1).

Furthermore, there is no evidence on the record that the Officers knew that Defendant himself was aware that the vehicle was an unmarked police vehicle. Rather, they merely testified broadly about being recognized in the area in general. (D.I. 34 at 10:16-21 & 63:14-18); *see Graves*, 877 F.3d at 498 (facts used to support reasonable suspicion must be "specific to the person who is detained"); *United States v. Castle*, 825 F.3d 625, 636-37 (D.C. Cir. 2016) (officers did not have reasonable suspicion when the government failed to put forth any evidence that defendant making furtive movements was aware that an unmarked vehicle was a police vehicle because "furtive gestures are significant . . . *only* if they were undertaken in response to police presence, [a]nd a suspect can respond to the presence of a police officer only if he has recognized him as an officer" (quoting *United States v. Brown*, 334 F.3d 1161, 1168 (D.C. Cir. 2003)) (internal quotation marks omitted)).

The Court understands that recollections may vary and does not suggest that corroboration regarding every detail of an encounter is required to support reasonable suspicion. Nor does the Court suggest that furtive conduct that officers have been trained to view as an indication that someone may be armed cannot allow a case of headlong flight to rise to the level of reasonable suspicion. Rather, here, the record viewed as a whole is insufficient to support a finding that Defendant's furtive conduct – even coupled with headlong flight – creates reasonable suspicion. Furthermore, as noted above, Defendant's flight was *not* a *Wardlow*-like flight, but rather resembled conduct in between that at issue in *Wardlow* and a mere refusal to cooperate.[13]

---

[13] Thus, even if the Court were to find that the area is high crime, the totality of the circumstances would not support a finding of reasonable suspicion. *See Johnson*, 332 F.3d at 208 ("[A] refusal to cooperate, without more, does not furnish the minimal level of

14

In addition, this is not a case in which the record supports a rational inference that Defendant was trespassing onto the residence or that those inside the residence were fearful of his presence. In its brief, the Government points to testimony from Officer Williams stating that he knew that Defendant did not live at 1313 East 28th Street based on his prior experience. (D.I. 34 at 18:22-23). The Government thus argues that the Officers had reasonable suspicion that Defendant was trespassing. Residents, however, were present when the Defendant ran into the house, and the record is devoid of any evidence (*e.g.*, conduct or statements from the residents) that suggests Defendant was uninvited or the residents were fearful of his presence. (*See* D.I. 31, Ex. H at 00:36 & Ex. I at 00:01). Rather, the evidence seems to point the other way. For example, Officer Rosaio apparently pushed one of the residents out of the doorway of the house to chase after Defendant. (*See* D.I. 34 at 69:3-8, D.I. 31, Ex. H at 00:36 & D.I. 31 at 4). That resident appeared to be agitated by the Officers presence after yelling "wait, wait" as the Officers entered the residence. (*See* D.I. 34 at 54:17-19 & D.I. 31, Ex. H at 00:32). Therefore, the Court cannot find that the video evidence, testimony and record as a whole support a finding that the Officers had reasonable suspicion that Defendant was trespassing onto the property.[14]

---

  objective justification needed for a detention or seizure." (quoting *Bostick*, 501 U.S. at 437) (internal quotation marks omitted)); *Valentine*, 232 F.3d at 357 ("Walking away from the police hardly amounts to the headlong flight considered in *Wardlow* and of course would not give rise to reasonable suspicion by itself, even in a high-crime area . . . ."). The evidence pertaining to Defendant's furtive movements and evasive conduct is too weak to support a finding of reasonable suspicion even in a high crime area.

[14] In addition, the Government argues that Defendant's conduct gave the Officers reasonable suspicion that he was resisting arrest or detention in violation of 11 Del. C. § 1257(b). The Government does not cite to any caselaw that interprets 11 Del. C. § 1257(b) as criminalizing flight from detention in addition to flight from arrest, and the Court is not aware of any law that does so. *See* D.I. 37 at 10 (citing *United States v. Anderson*, No. 11-30-GMS, 2011 WL 4442733, at *10 (D. Del. Sept. 23, 2011) ("Thus, because the court agrees with the government's contention that [Defendant] resisted arrest by his flight . . . the court need not address the issue of whether § 1257(b) criminalizes flight from

The Court thus finds that the totality of the circumstances fails to support a finding of reasonable suspicion.  Defendant was seized in violation of the Fourth Amendment.  All physical evidence obtained as a result of the seizure must be suppressed.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Evidence is GRANTED.  An appropriate order will follow.

---

detention.")).  Regardless, the Court has found that the Officers lacked reasonable suspicion at the moment of seizure.  Therefore, they were not conducting a lawful detention, nor, *a fortiori*, a lawful arrest.  See *Graves*, 877 F.3d at 498 ("The reasonable suspicion standard is lower than probable cause . . . .").  Thus, Defendant's conduct cannot serve as evidence to support reasonable suspicion that he was resisting a lawful arrest or detention.

16